**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CIS MANAGEMENT, INC., *et al.*, | |
| Plaintiffs, | Case No. 2:23-cv-02689-BRM-JRA |
| v. | **OPINION** |
| COMMERCE & INDUSTRY INSURANCE COMPANY, | |
| Defendants. | |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are Defendant Commerce & Industry Insurance Company's ("Commerce") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 ("Commerce's Motion") (ECF No. 31) and Plaintiffs CIS Management, Inc. ("CIS") and Harleysville Preferred Insurance Company's ("Harleysville") (collectively, "Plaintiffs") Motion for Declaratory Judgment ("Plaintiffs' Motion") (ECF No. 29). Having reviewed the submissions filed in connection with the motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been

shown, Commerce's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Declaratory Judgment is **DENIED**.

## I.    BACKGROUND

### A.  Factual Background[1]

CIS is the real estate management company[2] for a property at 230 Parker Road, Elizabeth, New Jersey, known as "Oakwood Plaza Apartments." (ECF No. 29-2 (CIS's Statement of Facts in Support of Declaratory Judgment) ¶¶ 3–4.) On December 12, 2014, a man named Bilal Fullman was shot to death on the premises of Oakwood Plaza Apartments, and on December 12, 2016, Nicole Fullman Roberts filed a complaint against CIS in the Superior Court of New Jersey, Union County related to the incident as administrator pro ad prosequendum of the Estate of Bilal Fullman (the "Fullman Roberts Matter"). (*Id.* ¶ 3.) CIS Oakwood maintained several insurance policies for

---

[1] The background facts are taken from the parties' admitted statements of material fact and accompanying exhibits. The Court deems supported factual contentions to be admitted, unless sufficiently disputed by reference to record evidence, and similarly construes as undisputed all facts in Defendants' Statement of Material Fact to which Plaintiff objects without citing to any record evidence. *See* L. Civ. R. 56.1(a); *Ullrich v. U.S. Sec'y of Veterans Affs.*, 457 F. App'x 132, 136–37 (3d Cir. 2012) ("[T]he party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. . . . A plaintiff's mere belief or contention . . . is not enough to create a dispute of material fact sufficient to survive summary judgment. . . . Federal Rule 56 explicitly requires the party asserting the absence or existence of a genuinely disputed fact to support that assertion by citing to specific parts of the record. A court may consider other materials in the record, but need only consider cited materials and may consider undisputed any fact not properly addressed by the party opposing it." (citations omitted)); *Stouch v. Twp. of Irvington*, Civ. A. No. 03-06048, 2008 WL 2783338, at *2 n.1 (D.N.J. July 16, 2008) ("deem[ing] [d]efendants' uncontested facts as admitted, unless disputed by [p]laintiffs in their brief and supported by the evidence"). Although the parties "aim to create the appearance of factual disputes," in some instances, the parties either do not cite to relevant record evidence or the cited evidence does not actually refute the relevant fact(s). *See Rau v. Allstate Fire & Cas. Ins. Co.*, 793 F. App'x 84, 87 (3d Cir. 2019).

[2] At the time of the incident, the Oakwood Plaza Apartments were owned by an entity called CIS Oakwood, LLC ("CIS Oakwood"). (ECF No. 29-2 ¶ 3.) CIS was the real estate manager on behalf of CIS Oakwood. (*Id.*)

the Oakwood Plaza Apartments during the period of the incident, including one with Harleysville (the "Harleysville Policy"), one with Commerce (the "Commerce Policy"),[3] and one with Endurance American Specialty Insurance Company ("Endurance" and the "Endurance Policy"). (*Id.* ¶¶ 4–8; ECF No. 31-3 (Commerce's Statement of Undisputed Material Fact) ¶¶ 1–4.)

The parties' dispute centers around which of CIS's insurers will cover the remainder of CIS's legal defense costs related to the Fullman Roberts Matter. (ECF No. 25 (Amended Complaint) ¶ 18.) The Endurance Policy provided $1 million in general liability coverage. (ECF No. 31-3 ¶ 1.) While the Endurance Policy covered initial defense costs in the Fullman Roberts Matter, its coverage obligations to CIS terminated in 2020 because CIS exhausted its $25,000 assault and battery limitation. (*Id.* ¶ 2; ECF No. 29-2 ¶ 7.) Specifically, the Endurance Policy stated Endurance would

> "pay those sums that the insured[, CIS,] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. . . . But: . . . Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B . . . ."

(ECF No. 29-8, Ex. D, at 3.) The Endurance Policy was modified by an endorsement creating an "Assault and Battery Each Occurrence Limit" of $25,000. (*Id.* at 4.)

The parties contest whether the exhaustion of the Endurance Policy's assault and battery limitation triggers the Commerce Policy to "step down" and cover the remainder of CIS's defense

---

[3] Commerce notes the Commerce Policy was in fact issued to an entity named "National Real Estate Purchasing Group." (ECF No. 33 (Defendant's Response to Plaintiffs' Statement of Undisputed Material Facts) ¶ 8; ECF No. 31-3 ¶ 4.) As Commerce does not dispute CIS is an insured under the Commerce Policy, however, the Court accepts that the Commerce Policy applied to CIS and the Oakwood Plaza Apartments during the relevant time period. (ECF No. 31-4 at 5 ("[T]here is no dispute that CIS is an 'insured' under the Commerce Policy by paragraph 5, Section 'M' in the 'Definitions' part of the policy.").)

costs. (ECF Nos. 29-2 ¶¶ 8–10; 33 ¶ 7.) Plaintiffs point to the Commerce Policy's definition of "insured," noting it includes "any person . . . or organization while **acting as your real estate manager**[.]" (ECF No. 29-2 ¶ 9.) While Commerce admits this language is in the Commerce Policy (ECF No. 33 ¶ 9), it denies it means the Commerce Policy drops down to cover the remaining defense costs (*id.* ¶ 11). Commerce notes the Commerce Policy "defines the 'Retained Limit' as 'the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance providing coverage to the Insured**'" (ECF No. 31-3 ¶ 6 (quoting ECF No. 29-11, Ex. G, at 30)), and that the Endurance Policy is not listed as a "Scheduled Underlying Insurance" in the Commerce Policy (*id.* ¶ 5). Plaintiffs contest this latter point, as they assert whether the Endurance Policy is "Scheduled Underlying Insurance" as defined in the Commerce Policy "is a question of law," not of fact. (ECF No. 34 at Sect. II, ¶ 5.)

In line with Plaintiffs' understanding of the Commerce Policy, on July 25, 2022, Harleysville sent a letter to Commerce and American International Group ("AIG"), requesting Commerce assume the cost of CIS's defense and indemnify it in the Fullman Roberts Matter. (ECF Nos. 29-2 ¶ 9; 33 ¶ 10.) Harleysville sent a "supplemental tender demand" to Commerce and AIG on August 29, 2022. (*Id.*)

### B. Procedural Background

CIS and Harleysville filed their initial Complaint in the Superior Court of New Jersey, Union County Law Division, against Commerce and AIG on March 15, 2023. (ECF No. 1-4.) On May 18, 2023, the matter was removed to this Court by Commerce and AIG. (ECF No. 1.) The parties then stipulated to the dismissal of AIG as a defendant on May 19, 2023, which was granted on May 22, 2023. (ECF Nos. 4, 6.) Commerce answered on May 25, 2023, and the parties entered a Joint Discovery Plan on July 10, 2023. (ECF Nos. 8, 10.) Following an initial scheduling

conference on July 18, 2023, the Court ordered the parties to complete mediation by November 30, 2023. (ECF No. 11.) On November 29, 2023, this case was reassigned to the undersigned from the Honorable Kevin McNulty, U.S.D.J. (ret.). (ECF No. 15.)

On January 24, 2024, counsel for Commerce wrote to the Court on behalf of the parties to convey that the parties "agree[d] that this is a coverage dispute that is controlled by the interpretation of written contracts." (ECF No. 19 at 1.) Because of CIS's concern that discovery into its underlying claim file could impact the ongoing litigation in the Fullman Roberts Matter, the parties requested leave of Court to defer discovery in this area and submit cross-motions for summary judgment on the threshold coverage issue. (*Id.*) On February 8, 2024, following a status conference with the parties, the Court ordered the parties to engage in a settlement conference prior to filing summary judgment motions. (ECF No. 23.) Subsequent to this status conference but before the settlement conference, CIS and Harleysville filed an Amended Complaint (ECF No. 24), and Commerce filed an Amended Answer (ECF No. 29.) The Court held two settlement conferences, one on April 30, 2024, and a second on May 20, 2024, but the parties were unable to resolve the matter. (ECF Nos. 27, 28.) On May 20, 2024, the Court ordered the parties to complete any remaining discovery by June 30, 2024, and set a summary judgment briefing schedule. (ECF No. 28.) CIS and Harleysville filed their Motion for Declaratory Judgment on July 29, 2024 (ECF No. 29), and Commerce filed its Motion for Summary Judgment on July 31, 2024 (ECF No. 31). Pursuant to this Court's order, the parties filed their respective briefs in opposition on August 14, 2024 (ECF Nos. 32–35), and their reply briefs on August 21, 2024 (ECF Nos. 36–37).

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A party asserting a genuine dispute of material fact must support the assertion by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) (citations omitted). Irrelevant or unnecessary factual disputes will also not preclude a grant of summary judgment. *See Anderson*, 477 U.S. at 248. Additionally, "mere speculation does not create genuine issues of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215–16 (3d Cir. 2011) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant adequately supports its summary judgment motion, the burden shifts to the nonmovant to "go beyond the pleadings

and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). In other words, in deciding a party's summary judgment motion, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice*, 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson*, 477 U.S. at 248, 255).

If the moving party bears the burden of proof at trial, summary judgment is not appropriate where the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553, 553 n.9 (1999) (noting "summary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U.S.C. § 1981"). On the other hand, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 322). A "genuine issue as to any material fact" cannot

7

exist if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

### B. Declaratory Judgment

The Declaratory Judgment Act provides that a Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The express language of the declaratory judgment statute and fundamental principles of standing under Article III of the Constitution limit this power to actions that present a "case or controversy." *Cutaiar v. Marshall*, 590 F.2d 523, 527 (3d Cir. 1979). The "actual controversy" requirement refers to the case or controversy requirement of Article III. *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1336 (3d Cir. 2007). In *Teva Pharmaceuticals*, the Third Circuit stated standing in the declaratory judgment context requires

> that the dispute be "definite and concrete, touching the legal relations of the parties having adverse legal interests"; and that it be "real and substantial" and "admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."

*Id*. (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). The court noted, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id*. (citation omitted).

8

"The statute creates a remedy only; it does not create a basis of jurisdiction, and does not authorize the rendering of advisory opinions." *Cutaiar*, 590 F.2d at 527. Moreover, "a party requesting a declaratory judgment must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Lattaker v. Rendell*, 269 F. App'x 230, 233 (3d Cir. 2008) (citation and internal quotations omitted).

In addition, the Declaratory Judgment Act gives courts discretion to determine "whether and when to entertain [such] an action." *Wilton v. Seven Falls*, 515 U.S. 277, 282 (1995); *see MedImmune*, 549 U.S. at 136 (explaining the Declaratory Judgment Act "has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants") (internal quotation marks omitted); *Pub. Affairs Assocs. v. Rickover*, 369 U.S. 111, 112 (1962) ("The Declaratory Judgment Act was an authorization, not a command."). As the Supreme Court has stated:

> The Declaratory Judgment Act provides that a court "*may* declare the rights and other legal relations of any interested party," 28 U.S.C. § 2201(a) (emphasis added), not that it must do so. This text has long been understood "to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *see also Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95, n.17 (1993); *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494–496 (1942). We have found it "more consistent with the statute," however, "to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp." *Wilton*, *supra*, at 289.

*MedImmune*, 549 U.S. at 136. Determination as to whether to exercise this discretion is guided by the Court's sense of "practicality and wise judicial administration," *Wilton*, 515 U.S. at 287–88, and numerous other factors such as "whether it would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the

parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.*, 892 F.2d 1066, 1072 (D.C. Cir. 1990).

### III.    DECISION

While Plaintiffs' Motion is styled as one for declaratory judgment and Commerce's Motion as one for summary judgment, both Motions ask the Court to interpret the terms of the Commerce Policy in relation to the Endurance and Harleysville Policies. (ECF Nos. 30 at 9–13; 31-4 at 13–25.) Plaintiffs argue the phrase "applicable limits" within the definition of "Retained Limit" in the Commerce Policy should be construed as "promis[ing] excess coverage when the limits of underlying insurance [such as the Endurance Policy] are subject to *any reduction or exhaustion of aggregate limits by payment of loss to which this policy applies*," such as the $25,000 assault and battery limitation in the Endurance Policy. (ECF No. 30 at 10–11.) Commerce argues it is unnecessary to consider the meaning of "applicable limits" here because the terms of the Commerce Policy clearly state it is an "excess" policy, which requires the insured to obtain "scheduled underlying insurance" totaling $1 million and "render[s] the Commerce [P]olicy *excess* to all other coverage contingent upon the satisfaction of the $1 million attachment point," regardless of any sublimits in other insurance policies. (ECF No. 31-4 at 16–21.) The parties also dispute whether the Harleysville Policy constitutes "Other Insurance" as defined in the Commerce

Policy. (*Id.* at 21–25; ECF No. 30 at 13–15.) However, the parties agree the interpretation of all relevant insurance policies is governed by New Jersey law. (ECF Nos. 30 at 7–8; 31-4 at 11–13.)

"Under New Jersey law, the words of an insurance contract should be given their everyday and common meaning," and "[w]hether the contract terms are clear or ambiguous is a question of law." *Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.*, 162 F.3d 789, 791–92 (3d Cir. 1998) (citing *Longobardi v. Chubb Ins. Co.*, 582 A.2d 1257, 1260 (N.J. 1990); *Sumitomo Mach. Corp. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996)). New Jersey courts consider a contract ambiguous when it "is susceptible of more than one meaning." *Sumitomo Mach.*, 81 F.3d at 332. Like federal courts, New Jersey state courts consider "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation" in determining "existence or absence of ambiguity[.]" *Am. Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 181 (3d Cir. 1995) (quoting *Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993)) (comparing "generally accepted principles of contract" with Supreme Court of New Jersey's summary of "this area of law" and finding them consistent). If, however, "the relevant terms in a contract are ambiguous, the issue must go to a jury." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 163 (3d Cir. 2001).

With this background in mind, the Court begins by examining whether, as a matter of law, the terms of the Commerce Policy that the parties raise are "susceptible of more than one meaning." *Sumitomo Mach.*, 81 F.3d at 332.

### A.  Contract Interpretation

Plaintiffs contend the term "applicable limits" in the relevant provisions of the Commerce Policy requires Commerce to cover CIS's costs once any limit in an underlying insurance policy, such as the Endurance Policy, is reached. (ECF No. 30 at 10–11.) Plaintiffs assert Section I.A

obligates Commerce to pay "those sums in excess of the Retained Limit that the Insured [CIS] becomes legally obligated to pay" and point out that "Retained Limit" is defined as "the total of underlying limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage to the Insured[.]" (*Id.* at 10.) Because the Commerce Policy's provision obligating CIS to maintain Scheduled Underlying Insurance states that "the total applicable limits of the Scheduled Underlying Insurance will not decrease, *except for any reduction or exhaustion of aggregate limits by payment of loss to which this policy applies*," Plaintiffs argue the undefined phrase "applicable limits" creates an "ambiguity" which New Jersey law requires reading in favor of the insured, meaning any reduction or exhaustion of the limits of Scheduled Underlying Insurance triggers Commerce's obligations. (*Id.* at 10–11.) Plaintiffs cite New Jersey law they contend "adheres to the principle of contra [proferentum[4]], which requires any ambiguities in an insurance contract to be resolved in favor of the insured." (*Id.* at 7–8 (citing *Pittston Co. Ultramar Am. v. Allianz Ins. Co.*, 124 F.3d 508, 520 (3d Cir. 1997); *Gibson v. Callaghan*, 730 A.2d 1278, 1282 (N.J. 1999)).) Plaintiffs assert that, "[w]hen there is ambiguity in an insurance contract, courts [must] interpret that contract to comport with the reasonable expectations of the insured" (ECF No. 30 at 8 (second alteration in original) (quoting *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001))), and any exclusions in an insurance policy "must be narrowly construed," with the burden on the insurer to show exclusion (*id.* (citing *Am. Motorists Ins. Co. v. L-C-A Sales Co.*, 713 A.2d 1007, 1013 (N.J. 1998))). Additionally, Plaintiffs compare the terms of the Commerce Policy to the policy at issue in *StarStone Nat'l Ins. Co. v. Polynesian Inn, LLC*, 815 F. App'x 431 (11th Cir. 2020), in which the Eleventh Circuit found the plaintiff's excess insurance policy would

---

[4] The Court notes Plaintiffs call this doctrine "contra referendum" in their moving papers. Based on its review of relevant case law, the Court believes "contra proferentum" to be the appropriate term. *See Pittston Co. Ulmtramar Am.*, 124 F.3d at 520.

not "drop down" when the general liability policy's assault and battery sublimit was reached because "the StarStone policy included an exclusion of coverage in cases involving an underlying sublimit of liability," as well as an explicit demand that the "total limits" of all underlying and other insurance be exhausted. (ECF No. 30 at 11–12.) In contrast, Plaintiffs assert the Commerce Policy contains neither an exclusion of sublimits nor a requirement to exhaust the total limits of all other insurance, but only vague references to the "applicable limits." (*Id.* at 12–13.) Because Commerce could have expressly excluded sublimits as a trigger for its policy, like the insurer in *StarStone*, but chose not to, Plaintiffs argue the Commerce Policy's general "promise of excess coverage following the 'reduction' of underlying policy limits," without further qualification, applies to sublimits like the one in the Endurance Policy. (*Id.* at 13.) Plaintiffs make similar arguments in their Opposition to Commerce's Motion (ECF No. 34) and Reply in support of Plaintiffs' Motion (ECF No. 37), noting a "seminal rule" of New Jersey case law is that a policy that fails to "make clear its intention to exclude . . . claims otherwise allowed thereunder" will be found to cover such claims (*id.* at 1 (quoting *Pinto v. N.J. Mfrs. Ins. Co.*, 839 A.2d 134, 140 (N.J. App. Div. 2004) (internal citation omitted))).

In its Motion and Opposition to Plaintiffs' Motion, Commerce argues the Commerce Policy's provisions unambiguously prohibit coverage of CIS's costs if the $1 million threshold is not met. (ECF Nos. 31-4 at 16–21; 32 at 13–18.) Commerce points to Section VI.C of the Commerce Policy, which states "under no circumstances will . . . inability to pay [of the insured or underlying insurers] require [Commerce] to drop down, replace or assume any obligation under Scheduled Underlying Insurance," and asserts this constitutes an "unambiguous" disavowal of any obligation to provide coverage before the $1 million threshold is reached. (ECF No. 31-4 at 19.) Commerce also cites Section IV.F, which dictates that "[i]f . . . a policy shown in the Schedule of

Underlying Insurance forming a part of this policy has a limit of insurance . . . less than the amount shown in such schedule, this policy will apply **in excess of the amount shown in the Schedule of Underlying Insurance**," i.e., $1 million. (*Id.* at 19–20.) Asserting this provision is "consistent with the structure and purpose of an *excess* umbrella policy[,]" Commerce contends the Schedule of Underlying Insurance indicates a threshold of $1 million in prior general liability coverage before the Commerce Policy's coverage is triggered, and Plaintiffs have not demonstrated this threshold was met. (*Id.* at 20.) Commerce argues the coverage grant, which explicitly disavows a "duty to defend" until the scheduled underlying insurance or "other insurance" is exhausted, and the provisions limiting the application of Commerce Policy to after the "retained limit" is met further demonstrate the Commerce Policy is a "'true' excess policy." (*Id.* at 21.) Commerce also cites a decision from the Superior Court of New Jersey, Appellate Division, which found an excess insurance policy with similar provisions to be unambiguous and not triggered by the exhaustion of an assault and battery claim sublimit in a priority policy with a $1 million general aggregate limit. (*Id.* at 17 (citing *Rivera v. Starstone Specialty Ins. Co.*, No. A-2345-21, 2024 WL 1364419, at *1 (N.J. Super. Ct. App. Div. Apr. 1, 2024)).)

Commerce asserts that, like in *Rivera*, the Commerce Policy "clearly and plainly identifies the dollar threshold which triggers its coverage." (*Id.* at 18 (quoting *Rivera*, 2024 WL 1364419, at *4).) In its reply, Commerce also argues "the terms and structure of the Commerce policy are identical in operation to the excess policy in the *Rivera* case," noting the term Retained Limit in the Commerce Policy serves the same function as the phrase "applicable underlying limit of insurance" in the *Rivera* policy, which the court found unambiguous. (ECF No. 36 at 2.) Similarly, Commerce cites New Jersey case law holding excess insurers were not obligated to "drop down" coverage when the retained limit of the underlying insurance was not met. (ECF No. 31-4 at 16–

17 (citing *Werner Indus., Inc. v. First State Ins. Co.*, 548 A.2d 188, 191–93 (N.J. 1988); *Johnson v. Plasser Am. Corp.*, A-2116-12T1, 2014 WL 714719, at *7 (N.J. Super. Ct. App. Div. Feb. 26, 2014); *Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assocs.*, 893 A.2d 53, 60 (N.J. App. Div. 2006)).)

Commerce also rejects Plaintiffs' argument that the use of the phrase "applicable limits" creates ambiguity within the Commerce Policy. (ECF No. 32 at 10–13.) First, Commerce argues the Policy's repeated statements of its application "in excess" or after exhaustion of the Scheduled Underlying Insurance reinforce that the Commerce Policy will not apply until the $1 million attachment point is met. (*Id.* at 6–9.) Second, Commerce points out the provision containing the "applicable limits" language also contains a proviso stating, "[i]f you fail to comply with these requirements, we will be liable only to the same extent that we would have, had you fully complied with these requirements." (*Id.* at 11.) Read in context, Commerce asserts this section of the Commerce Policy "provides that Commerce is "liable" *only to the extent it would have been* if the insured maintained the requisite amount of underlying insurance." (*Id.*) Commerce argues Plaintiffs' reading improperly isolates provisions of the Commerce Policy, contrary to New Jersey law's directive to consider the entire insurance policy and "whether harmony can be found between the alleged ambiguous language and the remainder of the policy." (*Id.* at 12 (quoting *Morrison v. Am. Int'l Ins. Co. of Am.*, 887 A.2d 166, 172 (N.J. App. Div. 2005)).) Because Commerce contends "*all provisions* [of the Commerce Policy] operate towards a unified, logical interpretation" that coverage begins only after exhaustion of $1 million in other coverage, "even if the insured fails to hew to the contractual requirements of maintaining $1 million in underlying coverage" or does not otherwise satisfy the Retained Limit, the "applicable limit" language is insufficient to dislodge that interpretation. (*Id.* at 13.) Additionally, Commerce asserts the fact that "applicable limits" is

15

undefined does not "vitiate the numerous, unambiguous provisions that reaffirm Commerce's $1 million attachment point" or reflect a reasonable reading of the Commerce Policy. (ECF No. 36 at 8–10 (citing *Powell v. Alemaz, Inc.*, 760 A.2d 1141, 1147 (N.J. App. Div. 2000); *Buczek v. Continental Cas. Ins. Co.*, 370 F.3d 284, 288 (3d Cir. 2004)).) Moreover, Commerce argues Plaintiffs' reading would allow an insured party to "unilaterally rewrite its excess policy to be a 'better' primary policy" by agreeing to sublimits or other conditions on the underlying insurance required by the excess policy that would effectively create a lower attachment point, contrary to New Jersey law. (*Id.* at 7.)

In evaluating whether ambiguity exists in an insurance policy, New Jersey law instructs courts to give "the words of an insurance policy . . . their plain, ordinary meaning." *Gibson*, 730 A.2d at 1282. Like with other contracts, courts must "read the document as a whole in a fair and common sense manner[.]" *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC*, 143 A.3d 273, 280 (N.J. 2016) (quoting *Hardy ex rel. Dowdell v. Abdul–Matin,* 965 A.2d 1165, 1169 (N.J. 2009)). If a policy's terms are unambiguous, courts cannot rewrite the policy to be "better . . . than the one purchased." *Gibson*, 730 A.2d at 1282 (citing *Longobardi*, 582 A.2d at 1260). However, because of the unique nature of insurance policies as contracts of adhesion where the insurer often has expertise the prospective insured lacks (particularly in the consumer context), New Jersey courts give them closer scrutiny, construing exclusions narrowly and resolving ambiguities "in favor of the insured in order to give effect to the insured's reasonable expectations."[5] *L-C-A Sales Co.*, 713

---

[5] This approach, also known as the doctrine of contra proferentum, does not apply when the contract is drafted by the insured or jointly negotiated. *See Newport Assocs.*, 162 F.3d at 794–95 (rejecting insured's argument for application of contra proferentum where insured, real estate development company, was involved in drafting policy at issue); *Werner Indus., Inc. v. First State Ins. Co.*, 548 A.2d 188, 192 (N.J. 1988) ("Were this a policy of personal insurance coverage, we might be more inclined to accept [a more expansive reading of coverage.] But this is a policy

A.2d at 1013 (citing *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992); *DiOrio v. N.J. Mfrs. Ins. Co.*, 398 A.2d 1274, 1280 (N.J. 1979)). In the insurance context, "[t]he test for ambiguity is whether the policy's phrasing is 'so confusing that the average policyholder cannot make out the boundaries of coverage.'" *Newport Assocs.*, 162 F.3d at 792 (quoting *Weedo v. Stone-E-Brick*, *Inc.*, 405 A.2d 788, 795 (N.J. 1979)). To demonstrate this level of ambiguity, the party must "provid[e] a reasonable reading of the contract, raising a question of fact as to the meaning of the contract and requiring resolution at trial." *Id.* However, reading a policy provision "in isolation" is not reasonable "when doing so would render another provision meaningless." *Homesite Ins. Co. v. Hindman*, 992 A.2d 804, 807 (N.J. App. Div. 2010) (rejecting reading home insurance contract's business exclusion to encompass renting rooms in home to boarders because it would render rental exclusion that kept residence with two or fewer boarders within coverage superfluous); *see also Hardy ex rel. Dowdell*, 965 A.2d at 1169–70 (finding construction of automobile policy provision as requiring scienter on permission to operate vehicle not reasonable when language in another provision excluded coverage based on scienter and would be rendered superfluous).

Reviewing the entirety of the Commerce Policy, the Court finds that Commerce's obligation to pay is triggered only when the insured's (i.e., CIS's) liability for bodily injury exceeds the Retained Limit listed in the Schedule of Underlying Insurance is unambiguous. The Commerce Policy describes its coverage as "in excess of the Retained Limit." (ECF No. 31-11, Ex. G, at Section I.A, Section IV.) The parties agree "Retained Limit" is defined as "the total of applicable limits of Scheduled Underlying Insurance and any applicable Other Insurance providing coverage

---

covering commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance.").

to the Insured." (*Id.* at Section VII.Z.) The Schedule of Underlying Insurance, which the Commerce Policy states is the source of "limits of insurance" for Scheduled Underlying Insurance (*id.* at Section VII.AA), makes clear the limits for general liability are a minimum of $1 million per occurrence (*id.* at 32). In Section IV.F, the Commerce Policy specifically contemplates a scenario where the limit of insurance for a policy obtained to comply with the Schedule of Underlying Insurance is greater or lesser than the minimum in the Schedule; when the limit is "less than the amount shown in such schedule, this policy will apply *in excess of the amount shown in the Schedule of Underlying Insurance* forming a part of this policy." (*Id.* at Section IV.F (emphasis added).) While Section VI.K, which Plaintiffs cite as creating the ambiguity that supports their reading, requires the insured party to keep Scheduled Underlying Insurance for the duration of the policy whose "total applicable limits . . . will not decrease, except for any reduction or exhaustion of aggregate limits by payment of Loss to which this policy applies[,]" it also clearly disavows any coverage obligation by Commerce if the insured "fail[s] to comply with these requirements[.]" (*Id.* at Section VI.K.) The Commerce Policy states Commerce "will be liable only to the same extent that [it] would have, had you[, the insured,] fully complied with these requirements." (*Id.*) Reading the Commerce Policy as a whole, Plaintiffs' interpretation of "applicable limits" as sublimits below the $1 million attachment point, such as the Endurance Policy assault and battery limitation, would render meaningless the provisions of the Commerce Policy that guide scenarios where Scheduled Underlying Insurance fails to meet the attachment point, such as Sections IV.F and VI.K. *See Hardy ex rel. Dowdell*, 965 A.2d at 1169–70.

Additionally, the language and structure of the Commerce Policy shows Plaintiffs' assertion that "applicable limits" means sublimits in the Scheduled Underlying Insurance is not reasonable. *See Newport Assocs.*, 162 F.3d at 792. As defined in the Commerce Policy (ECF No.

18

31-11, Ex. G, at Section VII.AA), the Schedule of Underlying Insurance contains a column entitled "Limits" for each listed policy or coverage (*id.* at 32–33). For each listed policy or coverage, the "Limits" column lists limits *applicable* to that type of coverage, such as for "each occurrence," "general aggregate," and "per location aggregate." (*Id.*) Plaintiffs' argument therefore asks the Court to disregard an obvious interpretation of "applicable limits"—the limits listed in the Schedule of Underlying Insurance—in favor of a definition relying on limits from outside the Commerce Policy and not discussed therein. This reading would have the Court rewrite the policy to be "better . . . than the one purchased[,]" which it cannot do. *Gibson*, 730 A.2d at 1282 (citations omitted). The recent *Rivera* decision in the New Jersey Appellate Division, 2024 WL 1364419, is also instructive. The court there rejected the argument that the phrase "applicable underlying limit" referred to an assault and battery sublimit because it was "undisputed" the equivalent to the Schedule of Underlying Insurance controlled, and that document "containe[ed] no reference whatsoever to the $50,000 assault and battery sublimit" raised by the plaintiff, just as here. *Id.* at *4. As there is no reference to the Endurance Policy's sublimit in the Commerce Policy's Schedule of Underlying Insurance, it is unambiguous it cannot be an "applicable limit."[6]

---

[6] Even if Plaintiffs' interpretation created some level of ambiguity, the Court is skeptical CIS would be entitled to a reading of such ambiguity in its favor under the doctrine of contra proferentum, as it is a sophisticated player in the real estate industry, rather than an uneducated consumer facing a contract of adhesion. *See, e.g.*, *Werner Indus.*, 548 A.2d at 192 (N.J. 1988) (noting that, as to "policy covering commercial risks procured through a broker, and thus involved parties on both sides of the bargaining table who were sophisticated with regard to insurance," contra proferentum would not apply); *McNeilab, Inc. v. N. River Ins. Co.*, 645 F. Supp. 525, 546–47 (D.N.J. 1986) (determining New Jersey law would not strictly construe contract in favor of insured because it was clear "the parties were of equal bargaining power," in part based on "the fifteen addenda to the policy, most of which added or subtracted specific form coverages over the years"), *aff'd*, 831 F.2d 287 (3d Cir. 1987). While the parties adduced no evidence on the circumstances under which CIS entered into the Commerce Policy, there are indicia the insured under the Commerce Policy are sophisticated actors who actively participated in its drafting, such as the many endorsements adding and removing properties (ECF No. 31-11, Ex. G, at 81–278) and the "Policyholder Notice," which alerts the insured "[t]he AIG member companies generally pay

Finally, the express disclaimer of any obligation to "drop down" in the event the insured or its underlying insurers are unable to pay (ECF No. 31-11, Ex. G, at Section VI.C) demonstrates the policy holder would not reasonably expect the Commerce Policy to apply to a sublimit. *L-C-A Sales Co.*, 713 A.2d at 1013 (finding it would defy insured's reasonable expectation for a wrongful termination claim to be covered by insurance policy with employee exclusion provision because "it unquestionably arose out of and in the course of [claimant's] employment"). While Commerce does not explicitly argue the Endurance Policy's sublimit constitutes an "inability to pay" as described in the Commerce Policy, this provision is consistent with the overall thrust of the other provisions discussed above that create a clear trigger point—$1 million—before Commerce's coverage begins, regardless of the insured's circumstances. Reading the "applicable limits" language "in the context of the entire policy," including Section VI.C, it is clear "harmony can be found between the alleged ambiguous language and the remainder of the policy" by applying the same attachment point there. *Morrison*, 887 A.2d at 541.

### B. Application

With the understanding that the Commerce Policy unambiguously requires CIS to meet the $1 million attachment point, the Court must determine if a reasonable jury could find this condition was satisfied, triggering Commerce's coverage obligations. *See Kaucher*, 455 F.3d at 423.

The parties agree Endurance's coverage obligations to CIS for the Fullman Roberts Matter terminated in 2020 because CIS exhausted its $25,000 assault and battery limitation in the Endurance Policy. (ECF Nos. 31-3 ¶ 2; 29-2 ¶ 7.) Plaintiffs have adduced no evidence CIS has accrued an additional $975,000 in loss, as defined in the Commerce Policy, in the Fullman Roberts

---

compensation to brokers and independent agents, and may have paid compensation in connection with your policy" (*id.* at 3).

Matter. As a result, there is no dispute the Fullman Roberts Matter has not triggered Commerce's coverage obligations under the Commerce Policy. *See Adams*, 452 F. App'x at 139.

Plaintiffs argue the Harleysville Policy's language demonstrates it is in excess over all other insurance, even the Commerce Policy, pursuant to an endorsement stating it is "excess over any other valid and *collectible insurance* available to [CIS as real estate manager]." (ECF No. 30 at 13 (emphasis added).) However, because there is no evidence Commerce Policy's $1 million attachment point was met, triggering Commerce's coverage, the Commerce Policy does not constitute "collectible insurance." Therefore, the Court need not construe this provision of the Harleysville Policy or the "Other Insurance" provision of the Commerce Policy, as they are immaterial to the question of Commerce's liability. *See Celotex Corp.*, 477 U.S. at 322–23.

Accordingly, because there is no genuine dispute of material fact regarding Commerce's obligation to cover costs related to the Fullman Roberts Matter—it has none—Commerce's Motion for Summary Judgment is **GRANTED,** and Plaintiffs' Motion for Declaratory Judgment is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, Commerce's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Declaratory Judgment is **DENIED**. An appropriate order follows.

Dated: March 5, 2025

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

21